## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO.

ROBERT MONTGOMERY, LYNNE
LAPIDUS, HENRY BARTH,
LAURIE HAIRE, GLENN FRIEDMAN,
ROSALYE FRIEDMAN, BETTI JANE CUOMO,
ANTHONY CUOMO, MARK HERON and
RAYMOND JANNELLI on behalf of themselves
and all others similarly situated,

      Plaintiffs,

                                            **CLASS ACTION**

vs.

ECKERT SEAMANS CHERIN & MELLOTT, LLC,
JOHN W. PAUCIULO, MICHAEL C. FURMAN,
JOHN GISSAS, and DEAN VAGNOZZI,

      Defendants.

_____/

### CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs, Robert Montgomery, Lynne Lapidus, Henry Barth, Laurie Haire, Glenn Friedman,

Rosalye Friedman, Betti Jane Cuomo, Anthony Cuomo, Mark Heron and Raymond Jannelli

("Plaintiffs"), bring this Complaint individually and on behalf of all others similarly situated, against

Eckert Seamans Cherin & Mellott, LLC ("Eckert Seamans"), John W. Pauciulo, Esq. ("Pauciulo"),

Michael C. Furman ("Furman"), John Gissas ("Gissas") and Dean Vagnozzi ("Vagnozzi"), and allege

as follows:

### INTRODUCTION

1.       This is an action against Defendants for their role in an investment scheme

orchestrated by convicted felon Joseph LaForte ("LaForte") through his company, Complete Business

Solutions Group, Inc. d/b/a Par Funding ("Par Funding").  Par Funding provided merchant cash

advances to small businesses, including hundreds of businesses in Florida.  Par Funding funded those

advances with investor money that flowed through numerous investment funds set up by brokers, advisers and others who recruited those investors.  Vagnozzi, Furman and Gissas are three of those individuals who set up funds through which Plaintiffs' and class members' money was invested into Par Funding.

2.      The promissory note investments offered to and purchased by Plaintiffs and class members were unlawful, unregistered securities.  In a case currently pending in this District, the Securities and Exchange Commission ("SEC") sued Par Funding, LaForte, Vagnozzi, Furman, Gissas, their funds and numerous others for violating the federal securities laws.  *SEC v. Complete Bus. Solutions Group, Inc.*, No. 20-cv-81205-RAR (S.D. Fla.).  Among those violations, the SEC alleges that investors were given offering documents rife with misrepresentations and omissions.  Most of the defendants in that case, including Furman and Gissas, have agreed to an injunction.

3.      Pauciulo and Eckert Seamans played an outsized role in the scheme.  Par Funding's agent-fund investment structure was developed by Pauciulo, a partner at Eckert Seamans.  Pauciulo represented all of the agent funds run by Vagnozzi, Furman and Gissas.  Pauciulo created the offering documents containing the misrepresentations and omissions.

4.      Those misrepresentations and omissions were material.  For instance, Pauciulo and Eckert Seamans performed due diligence on Par Funding in 2016 and asked for Par Funding's audited financial statements.  After Par Funding failed to provide any, Pauciulo and Eckert Seamans failed to warn investors in the offering documents that Par Funding had no audited financial statements.  Nor did Pauciulo or Eckert Seamans follow up with Par Funding about subsequent financials.  If they had, Pauciulo and Eckert Seamans would have learned that Par Funding received two audited financial statements prepared for 2017.  The first was unsigned and showed a loss resulting from an astonishing $33 million in "consulting fees" to Par Funding's insiders, including LaForte and his wife.  The second

2017 audited report showed a profit for the company but contained an adverse opinion stating that Par Funding's books and records did not present fairly.

5.     Pauciulo and Eckert Seamans also failed to include warnings in the offering documents about the fact that, despite being marketed as insured, Par Funding's merchant cash advances were not insured. Par Funding learned in 2018 that the $75 million credit insurance policy it purchased did not cover its merchants' defaults. Blaming its insurance broker, Par Funding told Vagnozzi, and Vagnozzi told Pauciulo, his confidante and the person he characterized as "pivotal" to the success of the offerings. But the lack of insurance was never disseminated to investors.

6.     Pauciulo and Eckert Seamans also knew about but failed to disclose to investors that Par Funding had instituted hundreds of lawsuits against merchants seeking hundreds of millions of dollars in missed repayments. These lawsuits undermined claims by Par Funding, Vagnozzi, Furman and Gissas that Par Funding had a miniscule 1-2% default rate.

7.     The offering documents drafted by Pauciulo and Eckert Seamans misrepresented the application of a registration exemption to the securities laws. Pauciulo and Eckert Seamans set up multiple agent funds for Vagnozzi and Gissas in an effort to avoid the Securities Act's limitations on unaccredited investors. Pauciulo and Eckert Seamans also knew that Vagnozzi, Furman and Gissas marketed their funds by general solicitation in violation of the Act.

8.     Pauciulo and Eckert Seamans also knew about but failed to disclose in the offering documents at least four state and federal regulatory investigations involving Par Funding, Vagnozzi, Furman, Gissas and/or their agent funds. These included investigations for which Eckert Seamans itself had been retained by Vagnozzi and his funds. Nor did Pauciulo or Eckert Seamans ever disclose to investors the fact that LaForte spent time in prison for larceny and money laundering.

9.     As a result, Plaintiffs and class members believed their investments were relatively safe. Had they known about these misrepresentations and omissions, or the other misrepresentations

and omissions described further on in this Complaint, they would not have invested. As a result of Defendants' actions, Plaintiffs' and class members' investments are worthless and they have stopped receiving any proceeds from those investments.

10.      Pauciulo and Eckert Seamans cannot avoid liability by hiding behind the attorney/client nature of their relationship to the other Defendants. Pauciulo devised and suggested the agent fund structure to Par Funding in early 2017, after the Pennsylvania securities regulators began investigating an improper "finders" structure that Par Funding had been using to solicit investors.

11.      Vagnozzi, Furman and Gissas touted their relationship to Pauciulo and Eckert Seamans in advertising and at investor seminars. For instance, Vagnozzi's website marketed the investment by stating that "[W]ith the help of Dean Vagnozzi's attorney, John Pauciulo, and one of the largest law firms in the Philadelphia region, clients at ABFP are able to 'invest like the big boys' by pooling their money together and creating Private Placement Memorandums . . . ." Vagnozzi also referenced Pauciulo in numerous radio advertisements. Pauciulo and Eckert Seamans knew that Vagnozzi, Furman and Gissas were trading on the names and reputations of Pauciulo and Eckert Seamans.

12.      Vagnozzi publicly stated on his website that Pauciulo's and Eckert Seamans' roles went beyond the normal attorney/client relationship and into that of an active business role. It stated, "All of the investment opportunities are carefully vetted and facilitated by one of the nation's largest law firms."

13.      Pauciulo agreed with this characterization. In conversations with third parties and investors, Pauciulo described his role as that of a partner who took part in the funds' development and decisionmaking processes. For example, when COVID hit, Pauciulo participated in a video sent to investors in which Pauciulo, attempting to convince investors to trust his advice and participate in a

debt restructuring, emphasized Eckert Seamans' role in almost every aspect of the investments sold by Vagnozzi:

> *[W]e* have created investment funds across a pretty wide scope of businesses. *We* have done real estate. *We* have done other alternative investment classes. More importantly, there is [sic] deals that *we* haven't done, right? *I mean there are industries and transactions that we did a lot of diligence around and decided, you know, that it's not right for us, you know, not the kind of investment we wanted to get into and I think we made some good calls on a couple of those* because *we* later found out that some of those went sideways. So I think *we* have been, you know, pretty disciplined in *our* approach and *have sought out*, you know, business opportunities that most people wouldn't be aware of and probably wouldn't have an opportunity to invest in for a whole bunch of reasons, you know, through these fund structures.

(emphasis added).

14.     Pauciulo's attempts at convincing investors were successful, as many agreed to sign "Exchange Notes" restructuring their deals so that they received 4% over seven years instead of 10-15% over one year. Pauciulo participated in another video sent to investors taking them through the Exchange Note and advising them about its various provisions. Pauciulo failed to point out a provision that purported to release the funds from any liability. Most investors signed the Exchange Note.

15.     At various times Pauciulo also vouched for Vagnozzi, Furman, Gissas and their funds in communications directly to investors.

16.     As a result of Defendants' actions, as described in more detail below, Plaintiffs and class members possess claims against each Defendant for breach of fiduciary duty; against Vagnozzi, Furman and Gissas for fraud; and against Pauciulo and Eckert Seamans for aiding and abetting breaches of fiduciary duty and fraud.

## JURISDICTION AND VENUE

17.     <u>Subject Matter Jurisdiction</u>. The Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because (i) the matter in controversy exceeds $5 million, exclusive of interest and costs; (ii) there are members of the proposed Class who are citizens

of different states than Defendants; and (iii) there are in the aggregate more than 100 members of the proposed class.

18.     Personal Jurisdiction.   Many of the Defendants' tortious acts and transactions constituting securities violations occurred in the Southern District of Florida.

19.     This Court has personal jurisdiction over Defendants because the causes of action alleged arise from Defendants' tortious acts within Florida, their engaging in business in Florida and causing injury to persons or property within Florida while engaged in solicitation and services within Florida.

20.     Furman and Gissas live in Florida and operate their businesses in Florida, including the agent funds at issue in this case.

21.     In addition, out-of-state Defendants Pauciulo, Eckert Seamans and Vagnozzi at all times material engaged in significant contacts within the State of Florida.  Pauciulo and Eckert Seamans represented several agent funds based in Florida.  In exchange for attorney's fees, Pauciulo and Eckert Seamans created offering memoranda and other documents that they sent into Florida and knew would be used to solicit Florida-based investors.  The investments related to merchant cash advances made by Par Funding, a company with its principal address in Palm Beach Gardens, Florida, to thousands of merchants including hundreds of merchants in Florida.  Eckert Seamans, through Pauciulo, also created video communications and allowed them to be sent to Florida investors with the intent of inducing those investors to sign Exchange Notes.

22.     Vagnozzi engaged in significant contacts within the State of Florida by soliciting Florida investors personally and through ABFP.  He did this directly and through various agent funds, including the funds of Furman and Gissas.  Vagnozzi, personally and through ABFP, recruited and trained the Furman and Gissas agent funds, and caused ABFP to run those agent funds' back offices. Vagnozzi and/or his entities received compensation arising out of the investments made by Florida

investors, including but not limited to compensation for managing the back offices of the Furman and Gissas agent funds.

23.     Venue.   Venue is proper in this forum pursuant to 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to the claim occurred in this District, and because Defendants are subject to this Court's personal jurisdiction with respect to this action.

## PARTIES

**1.     Plaintiffs**

24.     Plaintiff Robert Montgomery is a resident and citizen of the state of Florida, who resides in Miami-Dade County, Florida.

25.     Plaintiff Lynne Lapidus is a resident and citizen of the state of Florida, who resides in Miami-Dade County, Florida.

26.     Plaintiff Henry Barth is a resident and citizen of the state of Florida, who resides in Palm Beach County, Florida.

27.     Plaintiff Laurie Haire is a resident and citizen of the state of Florida, who resides in Tamarac, Florida.

28.     Plaintiffs Rosalye and Glenn Friedman are residents and citizens of the state of Florida, who live in Sumter County, Florida.

29.     Plaintiff Betti Jane and Anthony Cuomo are residents and citizens of the state of Florida, who live in Sumter County, Florida.

30.     Plaintiff Mark Heron is a resident and citizen of the state of North Carolina.

31.     Plaintiff Edward Raymond Jannelli is a resident and citizen of the state of New Jersey.

**2.     Defendants**

32.     Defendant Eckert Seamans is a national law firm formed in Pennsylvania with its principal place of business in Pennsylvania.

33.     Defendant Pauciulo is an individual who resides in Pennsylvania.  He is a Partner in the law firm of Eckert Seamans.

34.     Defendant Furman is an individual and a resident and citizen of the state of Florida, and is a resident of West Palm Beach, Florida.

35.     Defendant Gissas  is an individual and a resident and citizen of the state of Florida, and is a resident of Wildwood, Florida.

36.     Defendant Vagnozzi is an individual who resides in Pennsylvania.  He is the sole owner of ABFP and ABFP Management.

**3.    Relevant Non-Parties**

37.     Par Funding is a Delaware company started by Lisa McElhone and Joseph LaForte in 2011.  Its principal address is 20900 Northeast 30th Avenue in Aventura, Florida.  Through various agent funds, Par Funding solicited and obtained hundreds of investments from Florida investors.

38.     LaForte founded Par Funding with his wife, Lisa McElhone.  LaForte runs the day-to-day operations of Par Funding and acts as its *de facto* CEO.  He was introduced to investors as Par Funding's president.

39.     Abetterfinancialplan.com LLC d/b/a A Better Financial Plan ("ABFP") is a Pennsylvania limited liability company formed by Vagnozzi on November 12, 2010.  Vagnozzi owns and manages ABFP, and he claims it is his corporate alter ego.  ABFP is an investment firm that offers alternative investments.  Through various agent funds, ABFP solicited and obtained hundreds of investments from Florida investors.

40.     ABFP Management Company, LLC ("ABFP Management") is a Delaware limited liability company formed by Vagnozzi on March 11, 2010.  ABFP Management is wholly owned by Vagnozzi.  Through ABFP Management, Vagnozzi provides management services related to organizing and operating companies formed for the purpose of raising funds from investors and using

8

the investor funds to invest in alternative investments.  ABFP Management provides these services for the agent funds recruited by Vagnozzi in exchange for a portion of the investment returns.  This includes agent funds in Florida.

41.     ABFP Income Fund, LLC is a Delaware limited liability company formed by Vagnozzi on January 12, 2018.  According to the SEC Complaint, beginning no later than February 2, 2019, Vagnozzi, through ABFP Income Fund, LLC raised at least $22 million for Par Funding through the offer and sale of promissory notes to at least 99 investors.  Pauciulo and Eckert Seamans represented ABFP Income Fund and, among other things, drafted all documents pertaining to the formation of this entity and the offering documents.

42.     ABFP Income Fund 2, L.P. is a Delaware limited liability partnership formed in July 2018.  Vagnozzi, through ABFP Management, formed ABFP Income Fund 2 for the purpose of raising investor money to pool and invest in the Par Funding promissory notes through the offer and sale of limited partnership interests.  ABFP Management is the General Partner of ABFP Income Fund 2.  According to the SEC Complaint, beginning no later than August 8, 2018, Vagnozzi, through ABFP Income Fund 2, has raised at least $6 million for Par Funding, through the offer and sale of limited partnership interests in ABFP Income Fund 2 to at least 49 investors.  Pauciulo and Eckert Seamans represented ABFP Income Fund 2, and, among other things, drafted all documents pertaining to the formation of this entity and the offering documents.

43.     ABFP Income Fund 3, LLC is a Delaware limited liability company formed by Vagnozzi in January 2019 to raise money for Par Funding through the offer and sale of promissory notes.  Beginning no later than May 6, 2019, Vagnozzi, through ABFP Income Fund 3 raised at least $4 million for Par Funding, through the offer and sale of promissory notes to at least 20 investors.  Pauciulo and Eckert Seamans represented ABFP Income Fund 3, and, among other things, drafted all documents pertaining to the formation of this entity and the offering documents.

44.     ABFP Income Fund 4, LLC is a Delaware Limited-Liability Company formed by Vagnozzi on April 8, 2019, to raise money for Par Funding through the offer and sale of promissory notes.  Pauciulo and Eckert Seamans represented ABFP Income Fund 4, and, among other things, drafted all documents pertaining to the formation of this entity and the offering documents.  ABFP Income Fund 4 did not file a Form D Notice of Exempt Offering of Securities with the SEC.

45.     ABFP Income Fund 5, LLC is a Delaware limited liability company formed by Vagnozzi on August 7, 2019, to raise money for Par Funding through the offer and sale of promissory notes.  Pauciulo and Eckert Seamans represented ABFP Income Fund 5, and, among other things, drafted all documents pertaining to the formation of this entity and the offering documents.  ABFP Income Fund 5 did not file a Form D Notice of Exempt Offering of Securities with the SEC.

46.     ABFP Income Fund 6 LLC is a Delaware limited liability company formed by Vagnozzi on November 4, 2019, to raise money for Par Funding through the offer and sale of promissory notes.  Pauciulo and Eckert Seamans represented ABFP Income Fund 6, and, among other things, drafted all documents pertaining to the formation of this entity and the offering documents. ABFP Income Fund 6 did not file a Form D Notice of Exempt Offering of Securities with the SEC.

47.     ABFP Income Fund 7 LLC is a Delaware limited liability company formed by Vagnozzi on February 25, 2019, to raise money for Par Funding through the offer and sale of promissory notes.  Pauciulo and Eckert Seamans represented ABFP Income Fund 7, and, among other things, drafted all documents pertaining to the formation of this entity and the offering documents. ABFP Income Fund 7 did not file a Form D Notice of Exempt Offering of Securities with the SEC.

48.     ABFP Income Fund, LLC, ABFP Income Fund 2, LLC, ABFP Income Fund 3, LLC, ABFP Income Fund 4, LLC, ABFP Income Fund 5, LLC, ABFP Income Fund 6, LLC and ABFP Income Fund 7, LLC shall be referred to collectively as the "ABFP Agent Funds."

49.     ABFP Income Fund Parallel LLC; ABFP Income Fund 2 Parallel LLC; ABFP Income Fund 3 Parallel LLC; ABFP Income Fund 4 Parallel LLC; ABFP Income Fund 6 Parallel LLC; and ABFP Income Fund 7 Parallel LLC are Delaware limited liability companies that were formed by Vagnozzi, Pauciulo and Eckert Seamans on or about April 22, 2020, for the purpose of restructuring ABFP's unregistered merchant cash advance investments via various "Exchange Notes."

50.     Fidelis Financial Planning LLC (the "Furman Fund") is a Delaware limited liability company that was formed by Furman in April 2018 and has its principal place of business in West Palm Beach, Florida.  ABFP Management provides management services to the Furman Fund.  The Furman Fund is a pooled financial fund created for the purpose of raising investor funds for Par Funding, primarily from Florida investors.  Since no later than August 9, 2018, Furman, through the Furman Fund, has raised more than $5.8 million from investors for Par Funding through the offer and sale of promissory notes.  Pauciulo and Eckert Seamans represented the Furman Fund and, among other things, drafted all documents pertaining to the formation of this entity and the offering documents.

51.     Gissas, through Retirement Evolution Group LLC, operates agent funds that raise money for Par Funding through the offer and sale of promissory notes.  Retirement Evolution Group was formed in 2018 with its principal address in Wildwood, Florida.  Gissas is its President and sole manager.  Pauciulo and Eckert Seamans represented Retirement Evolution Group and, among other things, drafted all documents pertaining to the formation of this entity.

52.     Retirement Evolution Income Fund LLC is an Agent Fund formed in 2018 with its principal address in Wildwood, Florida.  Gissas is its President and sole manager.  Retirement Evolution Income Fund is a pooled investment fund created for the purpose of raising funds for Par Funding, primarily from Florida investors.  Since as early as May 2018, Gissas, through Retirement Evolution Income Fund, has raised more than $5.4 million from at least 62 investors, primarily in Florida, for Par Funding through the offer and sale of promissory notes.  Pauciulo and Eckert Seamans represented

11

Retirement Evolution Income Fund and, among other things, drafted all documents pertaining to the formation of this entity and the offering documents.

53.     Retirement Evolution Insured Income Fund LLC is an Agent Fund formed in 2019 with its principal address in Wildwood, Florida.  Gissas is its President and sole manager.  Retirement Evolution Insured Income Fund is a pooled investment fund created for the purpose of raising funds for Par Funding, primarily from Florida investors.  Gissas, through the Retirement Evolution Insured Income Fund, has raised money from investors for Par Funding through the offer and sale of promissory notes.  Pauciulio and Eckert Seamans represented Retirement Evolution Insured Income Fund and, among other things, drafted all documents pertaining to the formation of this entity and the offering documents.

54.     RE Income Fund 2 is an Agent Fund formed in 2019 with its principal address in Wildwood, Florida.  Gissas is its President and sole manager.  RE Income Fund 2 is a pooled investment fund created for the purpose of raising funds for Par Funding, primarily from Florida investors.  Since no later than August 1, 2019, Gissas, through RE Income Fund 2, has raised at least $150,000 from investors for Par Funding through the offer and sale of promissory notes. Pauciulio and Eckert Seamans represented RE Income Fund 2 and, among other things, drafted all documents pertaining to the formation of this entity and the offering documents.

55.     Spartan Income Fund is an Agent Fund formed in 2019 with its principal address in Mt. Laurel, New Jersey.  Upon information and belief, Vagnozzi has an ownership interest in Spartan Income Fund, which is managed by a subagent named John Myura, to whom Vagnozzi sends some clients who call in response to Vagnozzi's radio advertisements.  Spartan Income Fund is a pooled investment fund created for the purpose of raising funds for Par Funding.  Spartan Income Fund has raised an unknown amount from investors for Par Funding through the offer and sale of promissory

notes. Pauciulo and Eckert Seamans represented Spartan Income Fund and, among other things, drafted all documents pertaining to the formation of this entity and the offering documents.

56.     Retirement Evolution LLC, Retirement Evolution Income Fund LLC, Retirement Evolution Insured Income Fund LLC and RE Income Fund 2 will be collectively referred to as the "Gissas Funds."

57.     The ABFP Agent Funds, the Furman Fund, the Gissas Funds and Spartan Income Fund LLC will be collectively referred to as the "Agent Funds."

## FACTS

### 1.     Par Funding and the Merchant Cash Advance Business

58.     Plaintiffs' claims stem from Par Funding's "merchant cash advance" (or "MCA") business, which involves the purchase of future receivables from small businesses.  Generally speaking, these small businesses pledged future receivables and a significant fee percentage in exchange for quick cash from Par Funding.

59.     McElhone and LaForte, who are married, started Par Funding in 2011.  McElhone was Par Funding's only employee.  Starting in 2017, another company owned by McElhone, Full Spectrum Processing, Inc., operated Par Funding.  McElhone was not involved in either company's day-to-day operations.  The businesses were run by La Forte.  McElhone separately ran a nail salon in Philadelphia.

60.     Shortly before he started Par Funding, LaForte had been released from prison after serving a three- to 10-year sentence and paying $14.1 million in restitution for grand larceny, money laundering and conspiracy to operate an illegal gambling business.  Reputedly, LaForte's grandfather and uncle were members of the Gambino crime family.  LaForte used a number of aliases, including Joe Mack, Joe Macki and Joe McElhone.

61.     Par Funding funded hundreds of millions of dollars in MCAs.  Many of those MCAs resulted in profits to Par Funding that, if considered to be interest, would be usurious.

62.     In a 2018 article about Par Funding, LaForte and the merchant advance cash industry, *Bloomberg News* reported that this "new industry is in some ways a reincarnation of the loan-sharking rackets of a bygone era.  Cash-advance companies use a legal document called a confession of judgment to stack the deck against borrowers, just as payday lenders did a century ago.  Small-business lending was once infiltrated by the mob.  Today it's again a magnet for crooks, including some with alleged ties to organized crime."

**2.**     **Par Funding Starts by Raising Money Through Investor Promissory Notes**

63.     To fund the MCAs, Par Funding raised investor money through the offer and sale of securities in the form of promissory notes.

64.     From 2012 through 2017, Par Funding sold promissory notes directly to investors through a network of sales agents, or "Finders."  The Finders located and solicited investors in return for a "finder's fee" from Par Funding.

65.     Par Funding's assets, including its accounts receivable, secured the notes.  The notes stated that Par Funding would pay back the noteholder investor over 12 months, with interest ranging from 12- to 44-percent.

66.     By December 2017, Par Funding raised at least $90 million from investors through the offer and sale of promissory notes.  Investors sent funds directly to Par Funding or through self-directed IRA accounts.

**3.**     **Eckert Seamans and Pauciulo Conduct Due Diligence on Par Funding**

67.     Pauciulo and Eckert Seamans represented Vagnozzi's businesses, including ABFP, for more than a decade when, in mid-2016, ABFP hired Pauciulo and Eckert Seamans to conduct due diligence on Par Funding.

68.     As part of the due diligence, Pauciulo requested and received documents from Par Funding.  Through this process, Pauciulo learned the following: i) that Par Funding had no audited

financial statements; ii) that Par Funding had no insurance on merchant receivables; iii) that LaForte was not listed as an officer or director, even though Pauciulo knew that LaForte ran the business; and (iv) that Par Funding had filed hundreds of lawsuits against merchants, seeking tens of millions of dollars in defaulted repayments. This last fact was particularly important, as it contradicted claims by Par Funding that its merchant default rates were only 1% to 2%.

69.     Also, Pauciulo either did not run a background check on LaForte or ignored its results. In any event, Pauciulo learned from Vagnozzi no later than 2018 that LaForte was an ex-convict, and read the *Bloomberg News* article about Par Funding's questionable business practices in 2018.

70.     Pauciulo also either failed to review or ignored the fact that Par Funding's own offerings were unregistered securities that did not qualify for a registration exemption.

**4.     Vagnozzi Solicits Investments for Par Funding, Then for Intermediary Agent Funds**

71.     After Pauciulo and Eckert Seamans conducted due diligence on Par Funding, Vagnozzi was Par Funding's biggest Finder in 2016 and 2017. Through his company ABFP, Vagnozzi raised about $20 million for Par Funding in exchange for a finder's fee of 6% to 7% of each investment he solicited.

72.     As Pauciulo and Eckert Seamans knew, Vagnozzi's solicitations were made to the general public through radio advertisements, websites and seminars. They also knew that Vagnozzi uniformly touted Eckert Seamans' due diligence as a reason for investors to invest their money.

73.     In January 2018, Pennsylvania securities regulators subpoenaed Par Funding in connection with an investigation of Par Funding's use of unregistered Finders to solicit direct-to-Par Funding promissory notes. Par Funding told Vagnozzi about the investigation, and Vagnozzi told Pauciulo.

74.     Upon receiving the subpoena, Par Funding restructured its offering using a structure developed by Pauciulo and proposed through Vagnozzi. Under this structure, Par Funding issued

promissory notes to intermediary agent funds, which then issued notes to investors in exchange for their investment.  The agent funds funneled these investments to Par Funding, which then repaid investors through the agent funds, as follows:



75.     In September 2018, Par Funding assured the Pennsylvania securities regulators that it was no longer using Finders.  Par Funding never told regulators that it had simply replaced the Finders structure with the agent funds structure.

76.     Using the agent funds structure starting in January 2018, Vagnozzi continued to raise millions in investor funds for Par Funding.  With Pauciulo's assistance, Vagnozzi created a slew of agent funds, including the various ABFP Funds.  All told, Vagnozzi solicited tens of millions of dollars in investor funds through the ABFP Funds.

77.     Moreover, with crucial support from Pauciulo and Eckert Seamans, Vagnozzi greatly expanded the web of agent funds seeking investors throughout the country, particularly in Florida. Vagnozzi recruited other agents, including registered investment advisers and insurance advisers who had existing clients (and preexisting confidential fiduciary relationships built on trust and confidence), to create more agent funds.

78.     Pauciulo and Eckert Seamans helped start more than 30 agent funds nationwide.

79.     These new agent funds included the Furman and Gissas Agent Funds, through which Vagnozzi was able to reach into a pool of primarily Florida-based investors.  As described below, Vagnozzi received a cut of the Agent Funds' proceeds.

80.     Pauciulo and Eckert Seamans set up all of the Agent Funds' corporate entities and created the documents that the Agent Funds would need to solicit investors.  Pauciulo and Eckert Seamans created and provided private placement memoranda ("PPMs"), subscription agreements, corporate registration documents and other offering materials for each Agent Fund.  They set up a tax identification number for each Agent Fund.  They provided a management agreement to be executed by the Agent Funds and ABFP Management.  And Pauciulo and Eckert Seamans either drafted and filed, or advised the Agent Funds how to draft and file, the Agent Funds' Form D exemptions with the SEC.  These forms gave the public notice of an exempt securities offering of either debt or equity securities in reliance on Rule 506(b) of the Securities Act, 17 C.F.R. § 230.506(b).  The forms for the ABFP and Gissas Agent Funds were signed by Pauciulo or his associate.

81.     Vagnozzi and ABFP trained the new agents about how the Agent Funds worked, and provided them with marketing materials and an "Agent Guide" that had been reviewed by Pauciulo. The Agent Guide explained to agents, including Furman and Gissas, how to create an agent fund, telling them they merely need to choose a name and send it to Pauciulo with a $5,000 check.  It advised which banks to set up accounts and directed them to add an ABFP employee as an authorized signatory.

82.     Vagnozzi and ABFP Management acted as the new Agent Funds' back office, sending investor payments to Par Funding and distributing Par Funding's repayments to the new Agent Funds, which would then distribute to their investors.  Vagnozzi and ABFP Management performed these tasks so that agents like Furman and Gissas could "focus on selling."

83.     Upon receipt of the investor funds, Par Funding issued a note to the Agent Fund with a given rate of return.  The Agent Fund then delivered a note to its investor at a lower rate.  The difference between the two rates was kept by the Agent Fund, which gave 25% of that difference to Vagnozzi and ABFP Management pursuant to a management agreement.

17

84.     For their part, Pauciulo and Eckert Seamans received hundreds of thousands of dollars in fees from Vagnozzi, the ABFP Funds and the new Agent Funds in exchange for setting up these funds.

85.     At all times, Pauciulo and Eckert Seamans knew that all of the Agent Funds would be soliciting investors through general promotion activity such as radio, television commercials, the Internet, social media and/or dinner seminars.  Pauciulo and Eckert Seamans also knew about and allowed the Agent Funds to tell investors that Eckert Seamans, one of the largest law firms in the northeast United States, was involved in the offering.

86.     The ABFP Funds raised more than $30 million from investors, with the Furman and Gissas Agent Funds raising more than $5.8 million and $5.5 million, respectively.

87.     By March 2020, Vagnozzi claimed that 600 investors had invested in Par Funding through the various agent funds that he recruited, including the Furman and Gissas Agent Funds.

**5.      The Promissory Notes Were Not Exempt Unregistered Securities, and Pauciulo and Eckert Seamans Knew It**

88.     The promissory notes issued by the Agent Funds were securities within the meaning of the Securities Act, which unless exempt must be registered before being offered or sold in the United States.  15 U.S.C. §77e.

89.     Rule 506(b) under Section 4(a)(2) of the Securities Act provides a "safe harbor" from registration.  It provides objective standards for a company to rely on to claim an exemption.  Companies conducting an offering that qualifies under Rule 506(b) can raise an unlimited amount of money and can sell securities to an unlimited number of accredited investors.

90.     An offering under Rule 506(b) is, however, subject to certain requirements.  The offeror cannot conduct any general solicitation or advertising to market the securities.  The securities may not be sold to more than 35 unaccredited investors, who must meet the legal standard of having sufficient

knowledge and experience in financial and business matters to be capable of evaluating the merits and risks of the prospective investment.  Furthermore, all unaccredited investors must be given specific information relating to the offeror's financial condition.

91.     The Agent Funds' notes did not comply with the requirements of Rule 506(b).

92.     Vagnozzi, Furman and Gissas solicited investments in the Agent Funds via general solicitations and advertisements, including radio advertisements, investment seminars, seminars, flyers, television commercials, the internet and social media.

93.     The Agent Funds did not provide unaccredited investors with the financial information required by Rule 506(b).

94.     And the ABFP Funds and Gissas Funds sold their securities to more than 35 non-accredited investors.  One of ABFP's sales agents, Shannon Westhead, submitted a declaration to the SEC stating that "There are numerous ABFP Income Funds because when a fund reached 35 unaccredited investors or 99 investors total, ABFP would open a new fund."

95.     Through Pauciulo's active involvement in the documentation, offering and sales of the promissory notes and interactions with the Agent Funds and their principals, including Vagnozzi, Furman and Gissas, Pauciulo and Eckert Seamans knew that the Agent Funds' notes did not comply with the Rule 506 exemptions.

96.     Pauciulo drafted and signed "Form Ds" on behalf of the ABFP Funds and many of the Agent Funds, which were filed with the SEC and falsely claim an exemption from registration as a "private offering" under Rule 506(b).

97.     No Form Ds were even filed by Vagnozzi, Pauciulo or Eckert Seamans for ABFP Funds 4 through 7.

98.     Knowing of the multiple ongoing securities violations, Pauciulo and Eckert Seamans should have, but did not, withdraw from further representation of the Agents Funds.  Instead, they

helped facilitate the violation by, for example, creating separate funds to conceal the number of unaccredited investors.

**6.     Par Funding, Vagnozzi and ABFP Receive Significant Regulatory Scrutiny**

99.     During this time, Par Funding, Vagnozzi and ABFP received significant regulatory scrutiny, none of which was disclosed to investors by Vagnozzi, Pauciulo, Eckert Seamans, Furman or Gissas.

100.    In 2017, the SEC began investigating ABFP relating to another private placement created with the help of Pauciulo and Eckert Seamans that was unrelated to Par Funding.  The investigation lasted three years.  Pauciulo and Eckert Seamans represented ABFP relating to the investigation.  Furman and Gissas knew about the investigation prior to 2020.

101.    The SEC issued a subpoena to Eckert Seamans in July 2017 relating to the investigation. In June 2020, the SEC issued a Cease and Desist Order holding that ABFP and Vagnozzi willfully violated Section 5 of the Securities Act.  The SEC found, among other violations, that ABFP had attempted to skirt Rule 5(b)'s limitation on 35 unaccredited investors.  Each time a fund approached 35 unaccredited investors, a new, consecutively numbered fund would be created, and so on.  Pauciulo and Eckert Seamans created this structure and filed the Form Ds for each of these funds.  (ABFP, through Pauciulo and Eckert Seamans, did the same thing with the ABFP Funds in the Par Funding context).  The SEC also found that Vagnozzi's and ABFP's principal marketing techniques included frequent radio advertisements, mailers and seminars — also a violation of the exemption requirements.

102.    In November 2018, the Pennsylvania Department of Banking and Security investigated Par Funding's use of unregistered Finders and levied a $499,000 penalty.  Vagnozzi and ABFP knew about the New Jersey investigation, and told Pauciulo about it.

103.    In December 2018, the New Jersey Bureau of Securities issued a Cease and Desist Order against Par Funding.  The Order arose out of an investigation of Par Funding's sale of unregistered

securities and use of unregistered agents in New Jersey.  Vagnozzi and ABFP knew about the New Jersey investigation, and told Pauciulo about it, as well as Furman and other agents.

104.    In May 2019, the Pennsylvania securities regulators ordered Vagnozzi and ABFP to pay a $490,000 fine relating to the sale of Par Funding's promissory notes to investors.  Eckert Seamans represented ABFP in the action.

105.    In February 2020, the Texas State Securities Board issued an Emergency Cease and Desist Order against Par Funding, ABFP and a Texas-based agent fund called Merchant Growth.  The Order cited fraud and registration violations by the companies.  The Texas securities regulators found, among other things, that Par Funding and the agent fund did not qualify for a registration exemption because, among other reasons, Merchant Growth used general solicitations to recruit investors.  In the Texas action, Eckert Seamans represented ABFP, which it knew had solicited investors through radio ads and other general solicitations for years.

106.    Furman and Gissas knew about these investigations of Par Funding, Vagnozzi and ABFP prior to 2020.

**7.**      **Defendants Learn That Par Funding Does Not Have Merchant Credit Insurance**

107.    The Agent Funds told investors that Par Funding had purchased a $75 million credit insurance policy that would cover merchant defaults on the loans made to merchants by Par Funding.

108.    In late 2018, however, Par Funding learned that the policy it purchased from Euler Hermes did not cover the MCA business model.  It did not provide loan guarantee insurance.  Rather, it provided standard accounts receivables insurance.

109.    Par Funding let the worthless policy expire.  In a sham attempt to keep the PPMs in compliance, Par Funding purchased an inexpensive policy from Euler Hermes with $200,000 in unrelated coverage so that Par Funding and the Agent Funds could continue to represent that Par Funding was "insured."

110.     Par Funding told its agents, including Vagnozzi, that it did not have the proper merchant credit insurance.  Vagnozzi, in turn, told Pauciulo and Eckert Seamans.  Furman and Gissas also learned about this insurance issue prior to 2020.

111.     Yet Vagnozzi, Furman, Gissas and their Agent Funds continued to market the Par Funding MCAs as insured to investors, who relied on that representation.

112.     Vagnozzi, Pauciulo, Eckert Seamans, Furman and Gissas did not disclose to investors in the PPMs, supplemental documents or otherwise that Par Funding once touted loan guarantee insurance but ultimately never had it.

113.     Vagnozzi continued to conceal this from investors even after Par Funding declared a moratorium on payments shortly after the COVID-19 pandemic hit.  On March 26, 2020, Vagnozzi forwarded to investors an email from Par Funding announcing that distributions would be suspended.  Vagnozzi added commentary, including telling investors that Par Funding had insurance, but that a virus exclusion in the policy precluded any claim.  This was a lie, as Vagnozzi knew there was no coverage.

114.     Furman received Vagnozzi's email and forwarded it to his investors, passing off Vagnozzi's comments as his own.

115.      In an email dated April 20, 2020, Vagnozzi told investors he had reached out to Par Funding and Euler Hermes and was told that the insurance coverage was denied because of a virus exclusion in Par Funding's policy.  He also told investors that he had contributed $300,000 to the insurance premium when it was purchased.  None of this was true.

**8.     Investors Enter Into the Exchange Notes**

116.     Investors did not receive their April and May investment returns.

117.     Pauciulo helped convince investors to forego suing the Agent Funds for default, and to instead allow the funds to restructure the debt owed to them by Par Funding.

22

118.    On April 18, 2020, the investors received by email a video in which Vagnozzi and Pauciulo told investors that Pauciulo had reviewed Par Funding's financials and that Par Funding was insolvent.  Vagnozzi reassured investors that he believed Par Funding would rebound.  Vagnozzi and Pauciulo recommended that investors withhold filing lawsuits against Par Funding and opt instead to restructure the debt by accepting an Exchange Note.

119.    Through an Exchange Note, investors' returns would be reduced to 4% and their principal repayment term would be expanded from one year to seven years.

120.    Pauciulo told investors that Par Funding had a clean UCC report, and that investors who executed an Exchange Note would therefore be "first in line" to collect if Par Funding were to default on the new deal.  This was untrue.  Par Funding had numerous liens on its assets at the time.

121.    On April 26, 2020, investors received another video of Vagnozzi and Pauciulo in which Vagnozzi and Pauciulo again recommended that investors accept the Exchange Offering.

122.    In the video, Pauciulo walked investors through the offering documents, page by page.  Pauciulo never mentioned in the video a material provision in the Exchange Note — that investors would be releasing the Agent Funds, from any claims of liability relating to the offering documents, or any other claims.

123.    Nor did the Exchange Note or Pauciulo disclose any of the regulatory actions relating to Par Funding or the ABFP Funds, including but not limited to pending actions by the SEC and the state of Texas in which Eckert Seamans represented ABFP.

124.    In conference calls, Vagnozzi told Furman and Gissas about the advice given by Pauciulo and Eckert Seamans.  Pauciulo and Eckert Seamans knew that Vagnozzi would be passing on this advice, and information about Pauciulo's of Par Funding's financials, to Gissas, Furman and the Agent Funds.  Gissas, Furman and the Agent Funds passed on this information to investors.

23

125.    Relying on the representations made to them, and the expertise of Pauciulo, Vagnozzi, Furman and Gissas, investors felt they had no choice but to agree to the Exchange Offering and to replace their existing notes with new notes that offered less interest and thus a lower rate of return.

**9.    Defendants Owed Investors Fiduciary Duties**

126.    Each Defendant owed Plaintiffs and the class members a fiduciary duty.

127.    Vagnozzi, Furman, Gissas and their Agent Funds solicited and sold unregistered securities and acted as *de facto* investment advisors or brokers or financial advisors.  They sold securities to Plaintiffs.  They engaged in the business of effecting transactions in securities for the account of others.  They received transaction-based commissions and/or payments.  They provided advice and recommendations as to investment in Par Funding and the Agent Funds.  They actively solicited investments in the securities.  They advised Plaintiffs and class members as to the value of the Agent Fund securities and the investment in or purchase of those securities.  And they effected transactions in securities for the account of others.

128.    Vagnozzi, Furman, Gissas and their Agent Funds obtained the trust and confidence of Plaintiffs and class members by purporting to have superior knowledge and expertise in the promissory note investments, and in each instance advised Plaintiffs that their investment was lucrative and low risk.  That trust and confidence was reposed in Vagnozzi, Furman, Gissas and their Agent Funds, creating a fiduciary duty owed to Plaintiffs.

129.    For example, Furman told investors in the Furman Agent Fund: "We will show you WHY you want the most TRANSPARENT Advisor.  We have a Fiduciary duty to put YOU FIRST, we are INDEPENDENT Advisors and we don't fit you into an investment, we show you what investments and products fit YOU!  Whether it is treating you like family, or just being there to answer any question you might have at anytime, the United Fidelis Group will always put our clients first!  LET

24

US show you what makes us the TOP 1% of the TOP 1% of ALL ADVISORS NATIONALLY, and we still will put you first.  Ask for references we are happy to provide them!"

130.    Gissas stated on his website, "Retirement Evolution Group designs each strategy for your unique financial situation.  Our independence allows us to review the full range of products available in your state to determine which is best for you.  Our advisors review each case independently to create the best plan from our available services . . . ."

131.    Pauciulo and Eckert Seamans also owed Plaintiffs and class members fiduciary duties. They acted as the attorney for the Agent Funds, with knowledge that the purpose of the Agent Funds was to solicit investors using general solicitation and advertising methods that traded on Pauciulo's and Eckert Seamans' involvement and expertise.  Pauciulo and Eckert allowed Vagnozzi to use their names and professional reputations in marketing materials distributed to prospective investors, giving comfort to prospective investors that the Agent Funds were legitimate, financially sound investment funds that complied with all applicable regulatory and legal requirements.  Pauciulo and Eckert Seamans knew that Vagnozzi's radio advertisements touted the fact that "These investment opportunities . . . were created with the help of one of the nation's larges law firms."

132.    Eckert Seamans' name appeared as "Legal Counsel" in the PPMs distributed to investors of the Agent Funds.  The PPMs also stated that each Agent Fund "has engaged the law firm of Eckert Seamans Cherin & Mellott, LLC to advise the Fund on various legal matters, including issues relating to securities law, certain regulatory matters as well as certain tax matters."

133.    Pauciulo's and Eckert Seamans' involvement with the Agent Funds went far beyond a standard attorney/client relationship.  At all times material, Pauciulo characterized his role to investors and third parties as not just an outside counsel or an attorney providing routine legal services, but as a longstanding partner who took part in the funds' development and decisionmaking process.

134.    In addition to allowing the Agent Funds to use Pauciulo and Eckert Seamans in advertising and marketing, Pauciulo often interacted directly with investors.  Pauciulo took phone calls from investors with questions about Par Funding or the Agent Funds.  When speaking with those investors he often characterized his role as a partner with the Agent Funds, using the pronouns "we," "us" and "our" when discussing those funds.  For example, in a video sent directly to investors, he told them:

> [W]e have created investment funds across a pretty wide scope of businesses.  *We* have done real estate.  *We* have done other alternative investment classes.  More importantly, there is [sic] deals that *we* haven't done, right?  *I mean there are industries and transactions that we did a lot of diligence around and decided, you know, that it's not right for us, you know, not the kind of investment we wanted to get into and I think we made some good calls on a couple of those* because *we* later found out that some of those went sideways.  So I think *we* have been, you know, pretty disciplined in *our* approach and *have sought out*, you know, business opportunities that most people wouldn't be aware of and probably wouldn't have an opportunity to invest in for a whole bunch of reasons, you know, through these fund structures.

(emphasis added).

135.    Pauciulo also vouched for Vagnozzi, ABFP and the Agent Funds in front of investors.  For instance, Vagnozzi asked Pauciulo in one video: "You have gotten to know my staff has grown significantly.  You know everybody in the staff.  Point is[,] positive relationship, only positive things to say about myself and my staff, is that a fair statement?"  Pauciulo responded "Yeah, it is."

136.    As a result of statements like these and allowing the Agent Funds to use Pauciulo and Eckert Seamans in promotional materials, Pauciulo and Eckert Seamans sought to induce the trust of investors.  It worked, as investors reposed trust and confidence in Pauciulo and Eckert Seamans.

137.    The fiduciary relationship developed by Pauciulo and Eckert Seamans with investors is highlighted by comments made to convince Plaintiffs and the class members to execute the Exchange Notes.  Vagnozzi stated "There are individuals who are unclear on which direction they should go. . . . I am trying to make the best decisions I can for the most people and it's going to be impossible to make everybody happy."  Pauciulo then made statements in an effort to convince investors to sign the

Exchange Notes.  He told them he was a former SEC staff attorney who "investigated cases involving financial fraud, accounting fraud and insider trading."  He told them he was "very familiar with, you know, financial accounting."

138.    He also told investors that he had signed a nondisclosure agreement with Par Funding and reviewed Par Funding's financials.  He invited investors' reliance on his review of the financials. He said Par Funding was insolvent.  He did not tell investors that the financials he received were unaudited, or that Par Funding had tens of millions of dollars of cash in its accounts.

139.    Pauciulo presented three options to investors: sue Par Funding, put Par Funding into involuntary bankruptcy or restructure the debt.  Pauciulo took investors through the pros and cons of each option, telling them he had consulted with other Eckert Seamans attorneys in the firm's bankruptcy department.  Pauciulo concluded that "[Vagnozzi] and I have come to the conclusion that the workout gives us the best possible result . . . .  We think that's in the best interest of all investors."

140.    Pauciulo advised investors that if they agreed to a restructuring, they would go from an unsecured creditor status to a secured status, with the ability to get a first priority lien on Par's assets. He told investors that he did a lien search and that there were no liens on Par Funding's assets.

141.    Vagnozzi concluded that "[t]his is, we feel, a pretty cut and dry decision."

142.    In making these statements to investors, Pauciulo, Eckert Seamans and Vagnozzi intended to, and did, obtain the trust and confidence of Plaintiffs and class members by purporting to have superior knowledge and expertise about Par Funding's financial position and the benefits of the Exchange Notes.  That trust and confidence was reposed in Vagnozzi, Eckert Seamans and Pauciulo, creating a fiduciary duty owed to Plaintiffs.

143.    Defendants breached their fiduciary duty to the Plaintiffs via their misconduct, more particularly described throughout this complaint, including, but not limited to the misrepresentations and omissions described below.

**10.**     **Misrepresentations and Omissions in the Marketing and Sales of the Promissory Notes**

144.     The Agent Fund offering documents and Exchange Notes prepared by Pauciulo and Eckert Seamans contained numerous false and misleading statements, and concealed or omitted material information about the use of investors' funds and the risks associated with the Agent Funds. Each of these misrepresentations and omissions was material, and included the following:

a.     Audited Financials.  The offering documents failed to disclose that, as part of Pauciulo's and Eckert Seamans' due diligence inquiry into Par Funding, Par Funding did not provide audited financial statements.  As it turned out, Par Funding commissioned two sets of audited financial statements for 2017.  The first set showed the company losing money, with figures showing that Par Funding was taking investor money to pay more than $33 million consulting fees to its principals.  LaForte pressured the accounting firm to provide financials showing Par Funding in the black.  So, the accounting firm presented a second set showing Par Funding operating at a profit, while giving an adverse opinion highlighting Par Funding's improper characterization of bad debt expense.  Had Pauciulo and Eckert Seamans included a warning about Par Funding's financials in the offering documents, or otherwise followed up with Par Funding regarding subsequent financials and received the adverse opinion, then Plaintiffs and class members would not have invested in the Agent Funds.

b.     Merchant Credit Insurance.  The offering documents failed to disclose that Par Funding provided no proof of any insurance policies covering merchant defaults, even though Defendants knew that Par Funding and the Agent Funds touted that insurance to investors.   Par Funding's merchant credit insurance covered standard accounts receivable, not future accounts receivable.  Par Funding learned about this in 2018 but continued to pay premiums for the wrong coverage so that its agents could continue to

use insurance in its marketing materials and offering documents.  Defendants were made aware of this.  Underscoring the materiality of the merchant insurance and its cover-up, Vagnozzi subsequently lied to investors and said Par Funding's insurance claims had been denied for COVID-related reasons.

c.    <u>Securities Registration Violations</u>.  The offering documents falsely stated that the Agent Funds' promissory notes were being made pursuant to the private offering exemption within the Securities Act, and therefore did not require registration.  Pauciulo and Eckert Seamans knew, among other things, (i) that the Agent Funds were sold through general solicitations and advertisements (including advertisements touting Pauciulo and Eckert Seamans themselves), (ii) that required financial information was not provided to unaccredited investors and (iii) that the ABFP Funds and Gissas Funds exceeded 35 unaccredited investors.

d.    <u>Merchant Lawsuits</u>.  The offering documents failed to disclose the fact that Par Funding had filed hundreds of lawsuits against merchants seeking hundreds of millions of dollars in defaulted payments, which would have called into question the default rates touted by Par Funding, Vagnozzi, Furman, Gissas and others.  Each Defendant knew about these lawsuits, including Pauciulo and Eckert Seamans, which asked for and received this information in due diligence.  Since 2013, Par Funding has filed more than 2,000 lawsuits or legal claims against small businesses seeking more than $300 million in missed repayments, including more than 170 lawsuits seeking more than $37 million from Florida-based businesses.

e.    <u>Regulatory History</u>.  The offering documents failed to disclose Par Funding's regulatory history, including the fact that Pennsylvania, New Jersey, and Texas securities regulators filed actions against Par Funding and issued cease and desist orders relating to MCAs.

It also failed to disclose the regulatory history of Vagnozzi and his agent funds, including (i) an investigation by Pennsylvania securities regulators that resulted in a record fine, (ii) a Texas investigation involving Par Funding and the MCAs and (iii) an investigation by the SEC that began in 2017 and focused on some of the same registration violations as occurred here.  Pauciulo and Eckert Seamans knew about the Par Funding and the Vagnozzi-related regulatory actions, and even served as counsel of record in the latter.

f.  <u>Par Funding's Involvement</u>.  The offering documents failed to disclose that Par Funding was the merchant cash advance company that would receive investors' money.  Nor did the offering documents contain any warning that that this unnamed merchant cash advance company may be fraudulent, or that the information provided by Par Funding may be fraudulent or even incorrect.

g.  <u>LaForte</u>.  The offering documents failed to disclose that although LaForte ran Par Funding, he was not listed as an officer or director of the company.  In fact, the documents failed to disclose LaForte at all, including his criminal background of money laundering and larceny.  Defendants knew about LaForte's role with Par Funding and his background.

h.  <u>Commissions</u>.  The offering documents failed to disclose the fact that Par Funding was paying eye-opening and questionable commission rates to the Agent Funds of 20% or more.  The merchant cash advance business, not unlike most financing operations, works on high volumes and low margins.  These high commission rates call into question the legitimacy of Par Funding's business.

145.  Vagnozzi, Furman, Gissas and the Agent Funds consistently and uniformly made the misrepresentations and omissions listed above when marketing to investors.

146.     In addition, Vagnozzi, Furman, Gissas and the Agent Funds consistently and uniformly told investors in marketing and advertising materials that Par Funding had a rigorous underwriting process.  Contrary to the rigorous underwriting process Par Funding touted to investors, (i) there was no meaningful underwriting of the merchant cash advance loans to determine whether the borrowers had the ability to repay their loans, (ii) Par Funding often approved loans in less than 48 hours, without conducting an on-site inspection of the business; and (iii) Par Funding funded loans without obtaining information showing the business' profit margins, debt schedules, accounts receivable or expenses.

147.     Defendants, as promoters, syndicators, underwriters, issuers and sellers of the merchant cash investments, and as fiduciaries, had a duty to truthfully and completely disclose to investors all information that would be material to the purchase of the merchant cash advance investments, including the risks inherent in such investments, but Defendants failed to provide such disclosures.

148.     The misrepresentations and omissions alleged here are material, both individually and in the aggregate.  A reasonable investor would consider important the misrepresented facts and omitted information.  The disclosure of the omitted facts and/or release of accurate information would have altered the "total mix" of information available to investors.

149.     Defendants also knew how important information about Par Funding was.  Despite the offering documents' representations that the investments involved merchant cash compan*ies*, Par Funding was the only merchant cash advance lender that received investor money.  And the Agent Funds were little more than pass-through shell companies.  Thus, they knew that should Par Funding default on payments to the Agent Funds, investors would have little recourse to recover lost investments from those Agent Funds.

**11.**  **Pauciulo's and Eckert Seamans' Active Participation and Assistance in the Offer and Sale of the Unregistered Securities Through the ABFP Funds and Agent Funds**

150.    As a partner at Eckert Seamans, Pauciulo served as legal counsel for the Agent Funds. He advised them on numerous matters, including compliance with applicable Federal and State securities laws. Pauciulo is a highly sophisticated securities lawyer, well-versed in the stringent federal and state law provisions regulating the offer and sale of securities to investors.

151.    Eckert Seamans touts Pauciulo's expertise and his representation of the Agent Funds on its website, which states that Pauciulo "[r]epresented several individuals in the formation of funds through a private placement to invest in merchant cash advance business." According to Eckert Seamans' website, Pauciulo is the chair of the firm's Financial Transactions Group, a member of the firm's Business Counseling and Regulated Substances groups and "represents and advises clients with respect to corporate, securities, and real estate matters." He "has extensive experience in structuring, negotiating, and documenting complex business transactions, including mergers and acquisitions, corporate finance transactions, real estate acquisition and development projects, and private placements of securities." The website also notes that, "[p]rior to entering private practice, John was a staff attorney with the Securities and Exchange Commission's New York office."

152.    Pauciulo has a long-standing 16-year relationship with Vagnozzi and was deeply involved with the Agent Funds from their very inception. Over the years, Eckert Seamans collected hundreds of thousands of dollars in fees from Vagnozzi, ABFP, and the Agent Funds relating to Par Funding. Pauciulo's compensation was based in part on these fees.

153.    Pauciulo created the formation documents for the Agent Funds.

154.    Pauciulo knew about the misrepresentations and omissions described above. He attended ABFP investment seminars and participated in investor conference calls and other communications with Agent Fund investors. He knew about the uniform statements made in the

marketing materials and advertising created by the Agent Funds concerning risks, expected rates of return, default rates and insurance.  Eckert Seamans permitted its name to be used in the marketing material took no steps to correct, clarify or repudiate such statements.

155.    Eckert Seamans represented Vagnozzi and ABFP in the Texas and Pennsylvania regulatory actions and did not disclose those actions in the PPMs, did not amend the PPMs to include that information, and knew that the regulatory actions were not disclosed in the advertisements or marketing materials.  Pauciulo performed due diligence on Par Funding and was aware of its regulatory history and its manager's criminal record.

156.    Pauciulo and Eckert Seamans knew that his clients were engaged in multiple ongoing violations of the applicable federal and state securities laws.

157.    Rather than disclosing the ongoing securities violations or withdrawing from further representation, Pauciulo instead created and distributed further misleading PPMs for additional Agent Funds.

158.    Pauciulo was further aware of, and knowingly permitted, the Agent Funds' promotion of Eckert Seamans as legal counsel.

159.    In sum, Pauciulo was a knowing participant in the ongoing illegal sales of securities, played a substantial role in inducing the illegal sales and lent substantial assistance to an ongoing scheme to mislead investors.  Pauciulo knew or should have known that under the standards of the legal profession, a lawyer must not knowingly participating in a client's violation of securities laws.  In these circumstances, Pauciulo was professionally obligated to terminate its representation to avoid covering up and assisting the ongoing scheme.

**12.    <u>The SEC Action</u>**

160.    On July 24, 2020, the SEC filed an enforcement action against Par Funding, LaForte, McElhone, ABFP, ABFP Management, Vagnozzi, Furman, Gissas and the Agent Funds for numerous

violations of the federal securities laws, alleging they were operating a scheme to raise investor money through fraudulent unregistered securities offerings.  The SEC complaint seeks a permanent injunction of the defendants' business operations.

161.    On July 27, 2020, the court granted the SEC's motion for appointment of a receiver, and on July 28, 2020, the court granted the SEC's motion for temporary restraining order against the defendants.

162.    To date, all but Vagnozzi and the ABFP Funds have consented to a continued injunction.

## PLAINTIFF SPECIFIC ALLEGATIONS

163.    Plaintiff Henry Barth retired in June 2017 with a pension and a 401(k).  He first met Furman in August 2017 in response to an ad on TV from the JD Melberg Financial company about annuities.  Furman was the local representative for the West Palm Beach area.  In late 2018 after seeing advertisements in the *Palm Beach Post* about Furman's alternative investments, Barth met with him to discuss them.  Furman told Barth about the Furman Fund and about merchant cash advances.  Furman told Barth that an investment in the Furman Fund was safe and secure.  Furman provided Barth with a copy of the offering documents drafted by Pauciulo and Eckert Seamans.  Barth reviewed it and relied on it.  In April 2019, Barth invested $230,000 in the Furman Fund.  He received monthly returns until March 2020, when Furman told him that the underlying merchant cash advance company, Par Funding, had suspended further payments.  Barth lost his investment when the SEC brought down Par Funding and the Furman Fund as a result of misrepresentations and omissions in the Furman Fund offering documents.

164.    Plaintiff Laurie Haire invested $61,000 with one of the ABFP Funds, Merchant Services Income Fund, in 2019.  She was told by a representative, Michael Tierney, that the Fund was safe and secure.  She received a copy of the offering documents drafted by Pauciulo and Eckert Seamans.  She reviewed it and relied on them.  Haire received monthly returns until March 2020, when she received

34

emails from Vagnozzi that the underlying merchant cash advance company, Par Funding, had suspended further payments.  Haire lost her investment when the SEC brought down Par Funding and the ABFP Funds as a result of misrepresentations and omissions in the offering documents.

165.    Plaintiffs Robert Montgomery and Lynne Lapidus live in Miami but have a residence in The Villages, Florida.  They met John Gissas in 2019 after seeing an advertisement in The Villages' local paper, *The Daily Sun*, about alternative investments.  They went to several seminars hosted by Gissas, and visited Gissas at his office.  Gissas told them that an investment in the RE Insured Income Fund was safe and secure.  He told them that the underlying merchant advances were insured.  Gissas provided them with a copy of the offering documents drafted by Pauciulo and Eckert Seamans. Montgomery and Lapidus reviewed and relied on the documents.  They invested $350,000 and received monthly returns through July 2020, when the SEC brought down Par Funding and the Agent Funds as a result of misrepresentations and omissions in the offering documents.

166.    Plaintiffs Rosalye and Glenn Friedman live in The Villages, Florida.  They met John Gissas in 2019 after seeing an advertisement in The Villages' local paper.  They went to a seminar hosted by Gissas and visited Gissas at his office.  Gissas told them that an investment in the RE Insured Income Fund was safe and secure.  He told them that the underlying merchant advances were insured. Gissas provided them with a copy of the offering documents drafted by Pauciulo and Eckert Seamans. The Friedmans reviewed and relied on the documents.  They invested a total of $150,000, which they lost when the SEC brought down Par Funding and the Agent Funds as a result of misrepresentations and omissions in the offering documents.

167.    Plaintiffs Betti Jane and Anthony Cuomo live in The Villages, Florida.  They met John Gissas in late 2018 after seeing an advertisement in The Villages' local paper.  They attended a seminar hosted by Gissas and visited Gissas at his office.  Gissas told them that an investment in the RE Income Fund was safe and secure.  Gissas provided them with a copy of the offering documents drafted by

Pauciulo and Eckert Seamans. The Cuomos reviewed and relied on the documents. They invested $100,100 and received monthly returns until July 2020, when the SEC brought down Par Funding and the Agent Funds as a result of misrepresentations and omissions in the offering documents.

168.    Plaintiff Edward Raymond Jannelli lives in New Jersey and often heard Vagnozzi's radio advertisements about merchant cash advances, including Vagnozzi's statement that he "works with one of the largest law firms." In April 2019, Jannelli called the number in the ad and left a message. Myura's office called him back and made an appointment. He met with Myura and a colleague. They told him that an investment in Spartan Income Fund was safe and secure, and that the underlying merchant loans were insured by Allianz (the parent company of Euler Hermes). Myura provided him with a copy of the offering documents drafted by Pauciulo and Eckert Seamans. Jannelli reviewed and relied on the documents. He invested $101,000 and received monthly returns until March 2020, when Vagnozzi wrote to him saying that the underlying merchant cash advance company, Par Funding, had suspended further payments. Jannelli lost his investment when the SEC brought down Par Funding and the Agent Funds as a result of misrepresentations and omissions in the Agent Fund offering documents and Exchange Note.

169.    Plaintiff Mark Heron lives in Cary, North Carolina. In 2019, Heron spoke to Vagnozzi about investing in alternative investments. Vagnozzi told him that an investment in ABFP Income Fund 4 was safe and secure. Vagnozzi provided him with a copy of the offering documents drafted by Pauciulo and Eckert Seamans. Heron reviewed and relied on the documents. He invested $80,000 and received monthly returns until March 2020, when Vagnozzi told him that the underlying merchant cash advance company, Par Funding, had suspended further payments. Heron lost his investment when the SEC brought down Par Funding and the Agent Funds as a result of misrepresentations and omissions in the Agent Fund offering documents and Exchange Note.

## CLASS ACTION ALLEGATIONS

170.    Class Plaintiffs bring this lawsuit as a class action on behalf of themselves and all others similarly situated as members of the proposed Classes described as follows:

Nationwide Class.    All individuals who invested in the Agent Funds within the applicable statute(s) of limitation.

Vagnozzi Subclass.    All individuals who invested in one of the ABFP Agent Funds within the applicable statute(s) of limitation.

Furman Subclass.    All individuals who invested in one of the Furman Funds within the applicable statute(s) of limitation.

Gissas Subclass.   All individuals who invested in one of the Gissas Funds within the applicable statute(s) of limitation.

171.    The Class is represented by all Class Plaintiffs.  The Vagnozzi Subclass is represented by Heron, Haire, and Jannelli.  The Furman Subclass is represented by Barth.  The Gissas Subclass is represented by Montgomery, Lapdus, the Friedmans and the Cuomos.  Excluded from the Classes are the Defendants and their directors, officers, employees, independent contractors, directors, officers, employees, members, managers, spouses, children, relatives, agents or representatives.

172.    This action may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, because it meets all the requirements of Rule 23(a)(1-4), including the numerosity, commonality, typicality and adequacy requirements, and it satisfies the requirements of Rule 23(b)(3) in that the predominance and superiority requirements are met.

173.    Numerosity.  The members of the Classes are so numerous that joinder of all members is impracticable.  The Agent Funds sold securities in the form of promissory notes or limited partnership interests to hundreds of investors.  An exact number is unknown at this time, but the answer is contained in investor lists held by the Agent Funds.

174.    Commonality.  There are numerous questions of fact or law that are common to Class Plaintiffs and all the members of the Classes.  Common issues of fact and law predominate over any

issues unique to individual class members.  Issues that are common to all class members include, but are not limited to the following:

(a)   Whether the Agent Funds' offering documents contained material misrepresentations and omissions;

(b)   For the Vagnozzi Subclass, whether the Exchange Notes contained material misrepresentations and omissions;

(c)   Whether Defendants owed fiduciary duties to investors;

(d)   Whether Defendants breached those fiduciary duties to investors;

(e)   Whether Pauciulo and Eckert Seamans had knowledge of breaches of fiduciary duty by Vagnozzi, Furman and Gissas;

(f)   Whether Pauciulo and Eckert Seamans substantially assisted the breaches of fiduciary duty by Vagnozzi, Furman and Gissas;

(g)   Whether Pauciulo and Eckert Seamans had knowledge of material misrepresentations and omissions by Vagnozzi, Furman and Gissas;

(h)   Whether Pauciulo and Eckert Seamans substantially assisted the material misrepresentations and omissions by Vagnozzi, Furman and Gissas; and

(i)   Whether Class Plaintiffs and class members suffered damages.

175.   Typicality.  Class Plaintiffs have claims that are typical of the claims of all of the members of the Class.  Class Plaintiffs' claims and all of the class members' claims arise out of uniformly presented misrepresentations and omissions.  Furthermore, those claims arise under legal theories that apply to Class Plaintiffs and all other class members.

176.   Adequacy of Representation.  Class Plaintiffs will fairly and adequately represent the interests of the members of the Classes.  Class Plaintiffs do not have claims that are unique to Class Plaintiffs and not the other class members, nor are there defenses unique to Class Plaintiffs that could

undermine the efficient resolution of the claims of the Class.  Further, Class Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel, experienced in class action litigation, to represent them.  There is no hostility between Class Plaintiffs and the unnamed class members.  Class Plaintiffs anticipate no difficulty in the management of this litigation as a class action.

177.    Predominance.  Common questions of law and fact predominate over questions affecting only individual class members.  The only individual issues likely to arise will be the amount of damages recovered by each class member, the calculation of which does not bar certification.

178.    Superiority.  A class action is superior to all other feasible alternatives for the resolution of this matter.  Individual litigation of multiple cases would be highly inefficient and would waste the resources of the courts and of the parties.  The recoveries sought by Class Plaintiffs and class members are relatively small and unlikely to warrant individual lawsuits given the fees and costs, including expert costs, required to prosecute claims for those fees and premiums.

179.    Manageability.  This case is well suited for treatment as a class action and easily can be managed as a class action since evidence of both liability and damages can be adduced, and proof of liability and damages can be presented, on a classwide basis, while the allocation and distribution of damages to class members would be essentially a ministerial function.

180.    Ascertainability.  Class members are readily ascertainable.  The Agent Funds keep records with the names and contact information of class members.  Those records are in the Receiver's custody.

## COUNT I – NEGLIGENT MISREPRESENTATION
### (Against All Defendants)

181.    Class Plaintiffs incorporate the allegations of paragraphs 1 through 126, 145 through 150, and 161 through 181 as if fully set forth herein.

182.    Defendants prepared and/or provided Plaintiffs and class members with offering documents and Exchange Notes that included material misrepresentations and omissions that they knew or should have known were false and/or misleading to investors.

183.    Defendants had a duty to exercise reasonable care and competence in communicating information to Class Plaintiffs and class members through the offering documents and/or Exchange Notes.

184.    Defendants either knew of the falsity and/or misleading nature of the misrepresentations and omissions or made the misrepresentations and omissions without knowledge of their truth or falsity.

185.    Defendants knew and intended that Class Plaintiffs and class members would rely on offering documents in deciding whether to make the initial investment.  They knew and intended that Class Plaintiffs and class members would rely on the exchange documents and written statements and videos in deciding whether to execute the Exchange Notes.  Class Plaintiffs and class members were the specific class of persons for whose benefit and guidance Defendants intended to supply the information.

186.    Class Plaintiffs and class members justifiably relied upon misrepresentations and omissions in deciding whether to invest and deciding whether to invest and/or to enter into the Exchange Notes.

187.    Class Plaintiffs and class members' reliance on the misrepresentations and omissions was a substantial factor in causing their harm in an amount to be determined at trial.

188.    As a direct and proximate result of Defendants' negligent misrepresentations, Class Plaintiffs and class members have suffered damages in an amount to be determined at trial.

WHEREFORE, Class Plaintiffs, on behalf of themselves and all similarly situated class members, respectfully demand judgment against Defendants for their damages; pre- and post-judgment interest; and/or such other and further relief as the Court deems just and proper.

## COUNT II – BREACH OF FIDUCIARY DUTY
### (Against Pauciulo and Eckert Seamans)

189.    Class Plaintiffs incorporate the allegations of paragraphs 1 through 127 and 132 through 181 as if fully set forth herein.

190.    As set forth above, Pauciulo and Eckert Seamans owed fiduciary duties to Class Plaintiffs and class members.

191.    Pauciulo and Eckert Seamans gave legal advice directly to the ABFP Funds' investors through a series of videos, that investors should accept the Exchange Notes.

192.    Pauciulo and Eckert Seamans also knowingly allowed Vagnozzi, Gissas and Furman to use their names and professional reputations in advertisements, marketing materials, solicitations and offering materials investments.

193.    Pauciulo and Eckert Seamans sought to obtain investors' trust and confidence, and investors did repose trust and confidence in Pauciulo and Eckert Seamans.

194.    Pauciulo and Eckert Seamans breached their fiduciary duties to investors by (i) failing to disclose or supplement within the offering documents and Exchange Notes that the securities offered by the Agent Funds did not meet registration exemption requirements; (ii) failing to disclose or supplement within the offering documents and Exchange Notes material information they knew about insurance, lawsuits, regulatory actions, the lack of any audited Par Funding financial statements, LaForte's role in Par Funding or LaForte's background; and or (iii) failing to explain to the ABFP Funds' investors that the Exchange Notes included prejudicial releases.

195.    As a direct and proximate result of Pauciulo's and Eckert Seamans' breaches of fiduciary duty, Class Plaintiffs and class members have suffered damages in an amount to be determined at trial.

WHEREFORE, Class Plaintiffs, on behalf of themselves and all similarly situated class members, respectfully demand judgment against Pauciulo and Eckert Seamans for their damages; pre- and post-judgment interest; and/or such other and further relief as the Court deems just and proper.

## COUNT III – BREACH OF FIDUCIARY DUTY
### (Against Vagnozzi)

196.    Class Plaintiffs incorporate the allegations of paragraphs 1 through 132, 138 through 150, and 161 through 181 as if fully set forth herein.

197.    As set forth above, Vagnozzi owed fiduciary duties to investors in the ABFP Funds.

198.    Vagnozzi breached his fiduciary duties to Class Plaintiffs and class members by (i) failing to disclose or supplement within the ABFP offering documents and Exchange Notes that the securities offered by the Agent Funds did not meet registration exemption requirements; and (ii) failing to disclose or supplement within the offering documents and Exchange Notes material information he knew about insurance, lawsuits, regulatory actions, the lack of any audited Par Funding financial statements, releases in the Exchange Notes, LaForte's role in Par Funding or LaForte's background.

199.    As a direct and proximate result of Vagnozzi's breaches of fiduciary duty, investors in the ABFP Funds, including Heron, Haire, and Jannelli, have suffered damages in an amount to be determined at trial.

WHEREFORE, Plaintiffs Heron, Haire, and Jannelli, on behalf of themselves and those similarly situated, respectfully demand judgment against Vagnozzi for their damages; pre- and post-judgment interest; and/or such other and further relief as the Court deems just and proper.

## COUNT IV – BREACH OF FIDUCIARY DUTY
### (Against Furman)

200.    Class Plaintiffs incorporate the allegations of paragraphs 1 through 130, 144 through 150, and 161 through 181 as if fully set forth herein.

42

201.     As set forth above, Furman owed fiduciary duties to investors in the Furman Agent Funds.

202.     Furman breached his fiduciary duties to Class Plaintiffs and class members by (i) failing to disclose or supplement within the offering documents that the securities offered by the Agent Funds did not meet registration exemption requirements; and (ii) failing to disclose or supplement within the offering documents material information he knew about insurance, lawsuits, regulatory actions, the lack of any audited Par Funding financial statements, LaForte's role in Par Funding or LaForte's background.

203.     As a direct and proximate result of Furman's breaches of fiduciary duty, investors in the Furman Funds, including Barth, have suffered damages in an amount to be determined at trial.

WHEREFORE, Plaintiff Barth, on behalf of himself and those similarly situated, respectfully demands judgment against Furman for their damages; pre- and post-judgment interest; and/or such other and further relief as the Court deems just and proper.

## COUNT V – BREACH OF FIDUCIARY DUTY
### (Against Gissas)

204.     Class Plaintiffs incorporate the allegations of paragraphs 1 through 129, 131, 144 through 150, and 161 through 181 as if fully set forth herein.

205.     As set forth above, Gissas owed fiduciary duties to investors in the Gissas Funds.

206.     Gissas breached his fiduciary duties to Class Plaintiffs and class members by (i) failing to disclose or supplement within the offering documents that the securities offered by the Agent Funds did not meet registration exemption requirements; and (ii) failing to disclose or supplement within the offering documents material information he knew about insurance, lawsuits, regulatory actions, the lack of any audited Par Funding financial statements, LaForte's role in Par Funding or LaForte's background.

207. As a direct and proximate result of Gissas' breaches of fiduciary duty, investors in the Gissas Funds, including Montgomery, Lapidus, the Cuomos and the Friedmans, have suffered damages in an amount to be determined at trial.

WHEREFORE, Plaintiffs Montgomery, Lapidus, the Cuomos and the Friedmans, on behalf of themselves and those similarly situated, respectfully demand judgment against Gissas for their damages; pre- and post-judgment interest; and/or such other and further relief as the Court deems just and proper.

## COUNT VI – AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (Against Eckert Seamans and Pauciulo)

208. Class Plaintiffs incorporate the allegations of paragraphs 1 through 181 and 197 through 208 as if fully set forth herein.

209. Vagnozzi, Furman and Gissas fostered a special relationship with Class Plaintiffs and class members that engendered fiduciary duties of loyalty, care, honesty and/or good faith.

210. Vagnozzi, Furman and Gissas breached those fiduciary duties by (i) failing to disclose or supplement within the offering documents and Exchange Notes that the securities offered by the Agent Funds did not meet registration exemption requirements; and/or (ii) failing to disclose or supplement within the offering documents and Exchange Notes material information they knew about insurance, lawsuits, regulatory actions, the lack of any audited Par Funding financial statements, prejudicial releases in the Exchange Notes, LaForte's role in Par Funding and/or LaForte's background.

211. Eckert Seamans and Pauciulo knew about these breaches of fiduciary duty.

212. Nevertheless, Eckert Seamans and Pauciulo substantially assisted Vagnozzi, Furman and Gissas by, among other things (i) drafting the offering documents, Exchange Notes and registration forms, and (ii) communicating directly to clients and convincing them to sign the Exchange Notes.

213.    Eckert Seamans and Pauciulo benefited, earning hundreds of thousands of dollars in fees.

214.    As a direct and proximate result of Eckert Seamans and Pauciulo's aiding and abetting the breaches of fiduciary duty, Class Plaintiffs and class members have suffered damages in an amount to be determined at trial.

WHEREFORE, Class Plaintiffs, on behalf of themselves and all similarly situated class members, respectfully demand judgment against Eckert Seamans and Pauciulo for their damages; pre- and post-judgment interest; and/or such other and further relief as the Court deems just and proper.

## COUNT VII – FRAUD
### (Against Vagnozzi, Furman and Gissas)

215.    Class Plaintiffs incorporate the allegations of paragraphs 1 through 126, 145 through 150, and 161 through 181 as if fully set forth herein.

216.    As set forth above, Vagnozzi, Furman and Gissas perpetrated a fraud upon Class Plaintiffs and class members through materially false and misleading statements and omissions in connection with the offering and sale of the promissory notes and/or Exchange Notes.

217.    Vagnozzi, Furman and Gissas knew the statements to be false, and intended to induce Class Plaintiffs and class members' reliance on those misrepresentations and on the omissions.

218.    Class Plaintiffs and class members reasonably relied to their detriment upon those misrepresentations by investing in the promissory notes/limited partnership interests and/or by entering into the Exchange Agreements.

219.    As a direct and proximate result of the fraud, Class Plaintiffs and class members have suffered damages in an amount to be determined at trial.

WHEREFORE, Class Plaintiffs, on behalf of themselves and all similarly situated class members, respectfully demand judgment against Vagnozzi, Furman and Gissas for their damages; pre- and post-judgment interest; and/or such other and further relief as the Court deems just and proper.

## COUNT VIII – AIDING AND ABETTING FRAUD
### (Against Eckert Seamans and Pauciulo)

220.     Class Plaintiffs incorporate the allegations of paragraphs 1 through 126, 132 though 181, and 216 through 220 as if fully set forth herein.

221.     As set forth above, Vagnozzi, Furman and Gissas perpetrated a fraud upon Class Plaintiffs and class members through materially false and misleading statements and omissions in connection with the offering and sale of the promissory notes and/or Exchange Notes.

222.     Vagnozzi, Furman and Gissas knew these statements to be false.

223.     Class Plaintiffs and class members reasonably relied to their detriment upon those misrepresentations by investing in the Agent Funds.

224.     Investors reasonably relied to their detriment upon those misrepresentations by entering into the Agent Funds' Par Funding investments and/or the Exchange Agreements.

225.     Eckert Seamans and Pauciulo knew about the misrepresentations.

226.     Nevertheless, Eckert Seamans and Pauciulo substantially assisted Vagnozzi, Furman and Gissas by, among other things (i) drafting the offering documents, Exchange Notes and registration forms, and (ii) communicating directly to clients and convincing them to sign the Exchange Notes.

227.     Eckert Seamans and Pauciulo benefited from the scheme, earning hundreds of thousands of dollars in fees.

228.     As a direct and proximate result of Eckert Seamans and Pauciulo's aiding and abetting the fraud, Class Plaintiffs and class members have suffered damages in an amount to be determined at trial.

WHEREFORE, Class Plaintiffs, on behalf of themselves and all similarly situated class members, respectfully demand judgment against Eckert Seaman's and Pauciulo for their damages; pre- and post-judgment interest; and/or such other and further relief as the Court deems just and proper.

Date:  September 9, 2020.

Respectfully submitted,

LEVINE KELLOGG LEHMAN
SCHNEIDER + GROSSMAN LLP
*Counsel for Plaintiffs*
201 South Biscayne Boulevard
Miami Center, 22nd Floor
Miami, FL 33131
Telephone: (305) 403-8788
Facsimile: (305) 403-8789

By: */s/ Jason K. Kellogg, P.A.*
JEFFREY C. SCHNEIDER, P.A.
 Florida Bar No. 93324
 Primary: jcs@lklsg.com
 Secondary: acd@lklsg.com
JASON K. KELLOGG, P.A.
Florida Bar No. 0578401
Primary: jk@lklsg.com
Secondary: ah@lklsg.com
Victoria J. Wilson
Florida Bar. No. 92157
Email: vjw@lklsg.com
Secondary: acd@lklsg.com

SILVER LAW GROUP
*Co-Counsel for Plaintiffs*
11780 W. Sample Road
Coral Springs, Florida 33065
Telephone: 954.755.4799

By: */s/ Scott L. Silver*
    Scott L. Silver
    Florida Bar No. 95631
    Primary: ssilver@silverlaw.com